IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DALTON ROMERO,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br><br>Case No. 2:17-CR-354-DB<br><br>Judge Dee Benson |

Before the Court is Defendant's Motion to Suppress. [Dkt.19]. Defendant, Dalton Romero moves the Court to suppress evidence obtained during a search of Shayla Lucas (Lucas)'s apartment in Tooele, Utah on January 27, 2017. During the search, evidence was discovered which was used in charging Romero with the crimes of: felon in possession of a firearm in violation of 18 U.S.C. §922(g)(1); possession of an unregistered short-barreled shotgun in violation of 26 U.S.C. §5861(d); and possession of a controlled substance in violation of 21 U.S.C. §844(a). Defendant contends that the warrantless search was illegal under the Fourth Amendment of the United States Constitution.

An evidentiary hearing was held before the Court on December 11, 2017 at which

witnesses were questioned by both sides. [Dkt. 25]. The parties then briefed the motion. On March 1, 2018, they presented oral argument at a hearing before the Court. [Dkt. 28, 29]. Romero is represented by Ronald Yengich and the United States is represented in this matter by Ruth Hackford-Peer and Jacob Strain. Based on the parties' oral and written arguments and the relevant facts and the law, the Court enters the following Memorandum Decision and Order.

## FINDINGS OF FACT

In January, 2017, the Tooele police department received information that a man named Johnny Doerr (Doerr) had gone missing. Tooele Police Detective Jason Spencer was informed by Doerr's friends and family that Doerr was dependant on narcotics and owed a drug debt to Defendant Dalton Romero (Romero) and Brandon Jordan (Jordan). Tr. 61. Detective Spencer was told that Doerr had been robbed and pistol-whipped by the men. Tr. 61-62.

Jordan resides in Tooele, Utah. He is and was at the time of the search subject to supervision by Utah Adult Probation and Parole ("AP&P"). Tr. 13, 15. The probation agreement Jordan entered into with AP&P requires him to "obey all state, federal and municipal laws." Gov't Exh. 1. The agreement also requires him to "permit officers of Adult Probation and Parole to search [his] person, residence, vehicle or any other property under [his] control without a warrant at any time, day or night upon reasonable suspicion to ensure compliance with the conditions of the Probation Agreement." *Id*. Pursuant to the Agreement, he is prohibited from associating with others who are "involved in criminal activity" or are convicted felons. *Id*. Also, he may not possess firearms or other dangerous weapons. *Id.*

On January 27, 2017, Detective Spencer telephoned Tooele AP&P Supervisor, Officer Blake Beesley, and informed him that he was attempting to locate Jordan to question him about the missing man, Doerr. Tr. 60, 61. Given the allegations that Jordan had robbed and pistol-whipped Doerr, Officer Beesley was obviously interested in speaking with Jordan as well. If proven to be true, these allegations would constitute clear probation violations as well as criminal activity. Jordan's probation officer, Ben Queva, was out of town conducting field visits, so Officer Beesley and Detective Spencer went to Jordan's home. Tr. 10, 56, 60, 61. Accompanying them was AP&P Officer Bracken and Tooele Police Officer Danielson.

Jordan's wife answered the door and told them that Jordan was staying with his new girlfriend, Star Allen ("Allen"), at the apartment of Shayla Lucas ("Lucas"). Tr. 12, 35. Lucas was also on probation and was supposed to have reported to a drug treatment center that same morning but had failed to do so. Tr. 18-19. Lucas's probation agreement contained the same prohibitions against associating with anyone who is involved in criminal activity or who has been convicted of a crime. Govt. Exh. 2. Officer Beesley testified that if Jordan was staying at Lucas's apartment, it would be a violation of both of their probation agreements. T. 56. He therefore went to Lucas's apartment, in part, to verify that Lucas was complying with probation. *Id*.

When AP&P officers Beesley and Bracken and Detectives Spencer and Danielson arrived at Lucas's apartment, they saw Jordan's car in the parking lot. Tr. 20, 63. They also noticed an external surveillance camera coming out of the window of Lucas's apartment. Tr. 21, 63.

AP&P Officer Bracken knocked on the door. Receiving no response, he continued to

knock and announced, "Shayla, AP&P, come to the door." T. 22. Lucas answered the door and opened it wide enough to stick her head out. T. 22. She maintained that she was the only one in the apartment. Officer Bracken asked her to step out of the apartment. She opened the door to exit and left the door open, according to Officer Beesley. T. 24-26. Detective Spencer testified that when Lucas exited the apartment, she "just squeezed through the doorway" and shut the door behind her. T. 64. Either way, when Lucas had the door open, Officer Bracken noticed a pair of men's large red basketball shoes that he believed to be Jordan's, since Jordan is known to wear red. T. 24-26. At that point, Officer Beesley drew his taser, stepped into the apartment, calling for others to make themselves known. Tr. 28, 30. Lucas's brother, Landon Lucas and Defendant Romero came out of the bedroom located on the left and Allen and Jordan exited the bedroom on the right. Tr. 28-29, 34, 51. Once all occupants were in the hallway, they were placed outside the apartment in the breezeway with Detective Spencer. T. 28, 58.

Officer Beesley conducted a cursory search to clear the apartment. Tr. 30. In the back right bedroom, in plain view, he testified he saw a ziploc baggy half-full of a white crystal powdery substance next to Jordan's car keys. Tr. 31. Officer Beesley then called his supervisor at AP&P to inform him what was found and Officer Beesley was instructed to conduct a more comprehensive search of the apartment. Tr. 32-33.

During the more comprehensive search, illegal mushrooms and two weapons were found among Defendant Romero's possessions in the room he shared with Lucas. Tr. 34. Officers also found a box in the closet of Romero's room that contained a handgun, a sawed-off shotgun and ammunition. T. 34. Two handguns were also found in a safe located in the room where Jordan

4

had been. Romero was ultimately charged with felon in possession of a firearm, possession of an unregistered short-barreled shotgun, and possession of a controlled substance.

**DISCUSSION**

Defendant moves to suppress the evidence discovered in the search of Lucas's apartment on the basis that the Tooele City police used AP&P as a subterfuge to gain access to probationer Lucas's apartment without a warrant and that the subsequent cursory search was not justified as a protective sweep. The government contends that the search of Lucas's apartment did not violate the Fourth Amendment because it was proper under both the special needs exception to the warrant requirement. Alternatively, the government asserts that the search was justified as a protective sweep.

"A parolee's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable.'" *United States v. Warren*, 566 F.3d 1211, 1214 (10th Cir. 2009)(citing *Griffin v. Wisconsin*, 483 U.S. 88, 873 (1987)). "Ordinarily, a search of a home is reasonable only if it is authorized by a judicial warrant, which must be supported by probable cause." *Id*. (citations omitted). However, or searches of probationers and parolees and their homes, the Supreme Court has embraced a special needs exception to the warrant and probable-cause requirements. *Id*. S*ee also United States v. Mabry*, 728 F.3d 1163, 1166 (10th Cir. 2013).

I. Special Needs Exception

The United States Supreme Court has found that an exception to the warrant requirement exists where "special needs, beyond the normal need for law enforcement, make the warrant and

probable-cause requirement impracticable." *Griffin*, 483 U.S. at 873. "[P]robationers "do not enjoy the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special probation restrictions." *Id*. at 874. "These restrictions are meant to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large." *Id*. at 875. These goals "require and justify the exercise of supervision to assure that the restrictions are in fact observed." *Id*. Accordingly, "[s]upervision . . . is a 'special need' of the State permitting a degree of impingement upon privacy that would not be constitutional if applied to the public at large." *Id*.

A search which is carried out under the direction of AP&P meets the special needs exception and therefore complies with the Fourth Amendment if it is conducted pursuant to state law that satisfies the reasonableness requirement and where: (1) the probation officer has a reasonable suspicion that the probationer has committed a probation violation or crime; and (2) the search is reasonably related to the probation officer's duties. *United States v. Stewart*, 273 Fed.Appx 768 (10th Cir. 2008) (citing *United States v. Carter*, 511 F.3d 1264, 1268 (10th Cir. 2008); *United States v. Lewis*, 71 F.3d 358, 362 (10th Cir. 1995); *State v. Johnson*, 748 P.2d 1069, 1072-73 (Utah 1987)). Such a search is proper even when police officers participate in the search, as long as they are acting under the direction of the parole officer. *United States v. Freeman*, 479 F.3d 743, 748 (10th Cir. 2007) (the special needs exception does not extend to other law enforcement officers "unless they are acting under the direction of the parole officer.").

The Tenth Circuit Court of Appeals has determined that searches properly conducted by

Utah state probation officers satisfy the reasonableness inquiry. *Stewart*, 273 Fed. Appx at 768; *Carter*, 511 F.3d at 1268. The Court, therefore, must determine whether reasonable suspicion existed here and whether the search was reasonably related to the probation officer's duties.

A. Reasonable Suspicion

In the case of a probationer, AP&P should have a "reasonable cause to believe" that the search would reveal "evidence of either a crime or a probation violation." *Stewart*, 273 F.Appx at 770. "Reasonable suspicion is a less demanding standard than probable cause." *United States v. Treto-Haro*, 287 F.3d 1000, 1004 (10th Cir. 2002). "To determine whether the investigating officers had reasonable suspicion, [the Court] considers both the quantity of the information possessed by law enforcement and its reliability." *Id*. Pursuant to Utah law, reasonable suspicion may exist where the probation officer's "suspicion is based only on a tip by an anonymous informer, the police, or other sources." *State v. Martinez*, 811 P.2d 205, 209 (Utah App. 1991).

The Court finds that the undisputed facts establish that AP&P clearly had sufficient evidence to support a reasonable suspicion that Jordan and Lucas were in violation of their probation agreements for multiple reasons at the time of the search. AP&P Officer Beesley had been informed by the Tooele police that Jordan had allegedly pistol-whipped a now-missing man. Tr. 14. As a felon, Jordan is not allowed to possess weapons. When Officer Beesley, Detective Spencer and others went to see Jordan at the address he had given AP&P as his residence, Jordan's wife indicated that he had been staying with Lucas, who is also on probation. Jordan's failure to notify AP&P of his current address and the fact that he was living with

another probationer would both constitute additional probation violations. When AP&P arrived at Lucas's apartment, Jordan's car was in the parking lot. Tr. 20, 31. AP&P also noticed an external surveillance system set up in the window of Lucas's apartment. Tr. 21, 63. Lucas had failed to report to a treatment center that morning. Tr. 18, 24. Lucas lied to AP&P when she answered the door and indicated that no one else was in the apartment at the time. Exhibit 2 ¶9. All of this information supports a finding of reasonable suspicion that both Jordan and Lucas were in violation of their probation.

### B. Reasonably Related

The search must also be reasonably related to the probation officer's duties. *Stewart*, 273 F.App'x at 770. The undisputed evidence shows that Officer Beesley was employed as a supervisor within the AP&P division of the Department of Corrections. Tr. 7. While Officer Beesley was not Lucas's or Jordan's direct probation officer, he was familiar with both probationers. Tr. 7-8. When Detective Spencer spoke to Officer Beesley on the telephone and informed him that Jordan was reported to have pistol-whipped a now-missing man, Jordan's probation officer was out of town doing field visits. Tr. 10. Concerned about possible probation violations, Officer Beesley went to check on Jordan. Based on the facts presented at the hearing on this motion, the Court finds that the search of Lucas's apartment was reasonably related to Officer Beesley's responsibilities as an AP&P supervisor. The search was performed based on Officer Beesley's legitimate concerns relating to Jordan's and Lucas's lack of compliance with the terms of their probation agreements. See *Stewart*, 273 Fed. Appx at 770; *Lewis*, 71 F.3d at 363 ("To adequately deter misconduct and protect the public, [probation] agents must be

8

permitted to act expeditiously upon reasonable suspicion of a [probation] violation."). The Court finds that Officer Beesley directed the search and that Detective Spencer and others present acted under Officer Beesley's direction. Officer Beesley instructed Detective Spencer when to begin searching and what areas to search. Tr. 65-66.

The Court finds that Detective Spencer's telephone call to Officer Beesley, informing him about the allegations against Jordan and seeking Jordan's address in order to visit him in connection with his investigation into Doerr's disappearance was reasonable and logical. The Court finds that the facts underlying the way the search unfolded do not support Defendant's allegation of subterfuge.

Accordingly, the Court finds that the search meets the special needs exception and therefore complied with the Fourth Amendment.

## II. Protective Sweep

The "protective sweep" doctrine provides two exceptions to the warrant requirement when searching a home. *Maryland v. Buie*, 494 U.S. 325 (1990). The first type of protective sweep is proper as a precautionary measure and allows officers to "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id*. at 334. A second kind of sweep beyond the immediate area of arrest is proper when there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonable prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id*. at 335. The Tenth Circuit Court of Appeals has upheld protective sweeps of a residences after arrests even when the arrests

occurred outside of the residences. *See e.g., United States v. Cavely*, 318 F.3d 987, 995-96 (10th Cir. 2003).

At the point Lucas opened the door and stepped outside to talk with AP&P, she indicated that no one else was in the apartment. Tr. 22. However, officers had seen Jordan's car in the parking lot and his shoes just inside the doorway, which indicated that Jordan was likely present. Tr. 23, 27. Police officers had information that Jordan had pistol-whipped Doerr. This indicated that Jordan could be in possession of a firearm. Tr. 36, 61-62. Officers noticed external surveillance in the apartment window, facing outside. Because of the surveillance, any occupants of the apartment could be monitoring police, which could indicate the possibility of a surprise attack. *United States v. Mendoza*, 333 F.Supp.2d 1155, 1160 (D. Utah 2004)(holding that a search was justified as a protective sweep in part because the occupants of the home had external surveillance from which they could see the police approaching). Once Officer Beesley stepped into the apartment, he discovered that four additional people were inside. Tr. 28. At that point, Officer Beesley knew that Lucas lied about being alone and had no way of knowing whether any additional threat remained inside. Tr. 56.

The Court finds that under these circumstances, Officer Beesley was justified in conducting a protective sweep.

## CONCLUSION

"The Fourth Amendment's touchstone is reasonableness." *United States v. Knights*, 534 U.S. 112, 120 (2001). The Court finds that the search of Lucas's apartment was reasonable and

therefore proper under the Fourth Amendment on two independent bases. Based on the facts established, the search of Lucas's apartment met the requirements for the special needs exception to the warrant and probable cause requirements. It was also justified as a protective sweep to ensure officer safety. The Defendant's Motion to Suppress is hereby DENIED.

IT IS SO ORDERED.

DATED this 13th day of March, 2018.

_____
Dee Benson
United States District Judge